UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
                                      :

PHILLIP STONE, individually and on behalf of all others :
similarly situated,                                  :

                    Plaintiff,           :

                                  :

               -v-                        :          24 Civ. 3548 (JPC)

                                  :

EXOS HUMAN CAPITAL, LLC, and MEDIFIT    :       OPINION AND ORDER
COMMUNITY SERVICES LLC,                :

                                :

                  Defendants.       :

                                  :
----------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

        Congress enacted the Federal Arbitration Act ("FAA") to end judicial hostility to arbitration. Reflecting the statute's liberal policy favoring arbitration, Section 2 of the FAA makes written agreements to arbitrate "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 2 therefore requires courts to place arbitration agreements on equal footing with all other contracts, guaranteeing that like any ordinary contract, an agreement to arbitrate will be rigorously enforced according to its plain terms. And as part of the "supreme Law of the Land," U.S. Const. art. VI, the FAA preempts any rule of state law that stands as an obstacle to the full accomplishment of Congress's objectives in enacting the statute.

        In this wage-and-hour action under the New York Labor Law ("NYLL"), the alleged employers seek to compel arbitration of the plaintiff's statutory claims pursuant to an arbitration clause contained in the plaintiff's employment agreement. But that agreement is governed by New Jersey law, which makes agreements to arbitrate disputes in the employment context invalid unless

the agreement is clear and unambiguous, with an "explanatory comment" stating that an agreement to resolve a dispute through arbitration entails an agreement not to resolve that dispute in court. Applying that rule, this case would be easy: while the plaintiff's employment agreement unambiguously provides that "[a]ny controversy, dispute or claim arising out of or relating to" the parties' agreement "shall be settled by binding arbitration" in accordance with the American Arbitration Association's rules, it does not specifically state that agreeing to settle a dispute through private arbitration means agreeing not to settle that dispute through litigation in court. New Jersey law, therefore, would render the parties' arbitration agreement ineffective.

For the following reasons, however, the Court agrees with the employers that New Jersey's explanatory comment rule cannot invalidate the parties' arbitration agreement consistent with the FAA's liberal policy favoring arbitration. The Court also agrees with the employers that the parties' arbitration agreement is not otherwise substantively unconscionable and delegates authority to the arbitrator to determine whether the plaintiff's claim falls within the scope of the agreement. The Court therefore compels arbitration and stays this case pending the outcome of those proceedings.

## I. Background

### A.    Factual Background[1]

The relevant facts of this case, as alleged, are straightforward. Between roughly 2016 and May 2023, Phillip Stone allegedly worked as a "health fitness specialist" in New York City for

---

[1] "Courts deciding motions to compel apply a standard similar to the one applicable to a motion for summary judgment," meaning that they can consider relevant evidence outside the complaint. *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 281 n.1 (2d Cir. 2019). In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor." *Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011).

EXOS Human Capital, LLC ("Exos") and its wholly owned subsidiary, MediFit Community Services LLC ("MediFit"). Dkt. 18 ("Am. Compl.") ¶ 49. Stone alleges that "[d]espite regularly spending more than twenty-five percent of his daily job duties performing . . . physical tasks, [he] was always compensated by [Exos and MediFit] on a bi-monthly basis." *Id.* ¶ 51; *see* N.Y. Lab. Law § 191(1)(a).[2] As a result of his employers' "untimely wage payments," Stone alleges that he was "underpaid for . . . each bi-monthly pay period," including the period beginning December 1, 2022, and ending December 7, 2022, as well as for the period from December 8, 2022, to December 14, 2022. Am. Compl. ¶¶ 52-56. Those late wage payments, Stone says, denied him "the time value of his money" and rendered him "unable to invest, save, or purchase utilizing the wages he earned and was owed that [were] not delivered on a timely basis." *Id.* ¶ 57.

When Stone began his employment, he signed an employment agreement dated March 2017. Dkt. 24-1 ("Spinks Decl.") ¶ 6; *see* Spinks Decl., Exh. A ("Agreement"). The Agreement, among other things, governed Stone's employment relationship with MediFit. Agreement at 2. Specifically, the Agreement provided that it "creates an employment at will" between Stone and MediFit, *id.* § 1.1, and obligated MediFit to compensate Stone "as outlined in [his] offer letter," *id.* § 1.2. The Agreement also provided that MediFit was required to pay Stone "in accordance with [the company's] regular payroll and withholding procedures." *Id.* And it gave Stone the title of "Personal Trainer, with such duties and responsibilities as are commensurate with that position or as may be assigned from time to time by [MediFit]." *Id.* § 1.4. The Agreement required Stone

---

[2] Specifically, Stone alleges that "over twenty-five percent of [his] duties were physical tasks, including but not limited to: (1) moving around weights; (2) wiping down workout equipment; (3) emptying garbage pails; (4) cleaning and wiping down bathroom and shower facilities; (5) leading group workouts; (6) demonstrating workouts to clients; and (7) standing for long periods of time." Am. Compl. ¶ 50.

to "perform [his] duties and responsibilities . . . faithfully and diligently, in accordance with the policies and procedures of [MediFit]." *Id.*

The Agreement also contained an arbitration clause, which read in full:

> <u>Arbitration</u>. Any controversy, dispute or claim arising out of or relating to this Agreement, or any breach thereof, shall be settled by binding arbitration in accordance with the rules of the American Arbitration Association [("AAA")] then in effect and judgment upon such award rendered by the arbitrator may [be] entered in any court having jurisdiction thereof, and the parties hereto consent to the jurisdiction of the federal and state courts located in Arizona for this purpose. The arbitration shall be held by a single arbitrator in the Phoenix, Arizona area.

*Id.* § 13. Finally, the Agreement contained a choice-of-law provision selecting the law of the State of New Jersey. *Id.* § 7. Stone and MediFit are the Agreement's signatories. *Id.* at 2, 9.

## B.  Procedural History

Stone filed this civil action against Exos and MediFit on May 8, 2024, seeking to represent a class of Exos and MediFit's New York employees. Dkt. 1. Through a First Amended Complaint filed on October 1, 2024, Stone asserts a single cause of action for failure to timely pay wages against both companies under Section 191(1)(a) of the NYLL. Am. Compl. ¶¶ 58-61. Stone principally seeks an award of monetary damages representing the amount of underpayments caused by Exos and MediFit's alleged untimely wage payments to their New York employees. *Id.* ¶ 61.

On December 5, 2024, Exos and MediFit filed a motion to compel arbitration of Stone's NYLL claim, with the arbitrator to resolve any questions of arbitrability, or, in the alternative, to dismiss Stone's claim against Exos on the ground that the First Amended Complaint fails to plausibly allege that Exos was Stone's employer. Dkt. 24; *see* Dkt. 24-3 ("Motion"). Stone opposed the motion on February 5, 2025, arguing that the arbitration clause in the Agreement is invalid and unenforceable under New Jersey law, that his statutory NYLL claim is otherwise beyond the scope of the provision, and that the First Amended Complaint adequately alleges that

Exos was his employer.  Dkt. 27 ("Opposition").  Exos and MediFit then filed a reply on February 26, 2025, which countered that the principles of New Jersey law relied upon by Stone to challenge the validity of the Agreement's arbitration clause are preempted by Section 2 of the FAA, 9 U.S.C. § 2.  Dkt. 29 ("Reply").  The Court authorized Stone to file a surreply, Dkt. 30, which he did on June 10, 2025, Dkt. 31.  The Court held oral argument on Exos and MediFit's motion on June 18, 2025.

## II.  Legal Standard

Under the FAA, a written agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Before compelling arbitration, a court must therefore perform a two-step inquiry that looks at contract law principles "governed by state rather than federal law."  *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel* ("*Cap Gemini*"), 346 F.3d 360, 365 (2d Cir. 2003).  At step one, the court must determine whether "the parties enter[ed] into a contractually valid arbitration agreement."  *Id.*  At step two, the court first asks "whether a court or an arbitrator should decide if the dispute falls within the scope of the agreement to arbitrate."  *Convergen Energy LLC v. Brooks*, No. 20 Civ. 3746 (LJL), 2020 WL 5549039, at *13 (S.D.N.Y. Sept. 16, 2020) (internal quotation marks omitted).  "[I]f the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019).  But if it does not, then the court must determine whether "the parties' dispute fall[s] within the scope of the arbitration agreement."  *Cap Gemini*, 346 F.3d at 365.

Finally, the court considers "whether one party to the agreement has failed, neglected or refused to arbitrate."  *Beijing Shougang Mining Inv. Co. v. Mongolia* ("*Beijing Shougang*"), 11 F.4th 144, 162 (2d Cir. 2021) (internal quotation marks omitted).  "A party has refused to

arbitrate if it commences litigation or is ordered to arbitrate the dispute by the relevant arbitral authority and fails to do so." *Id.* (internal quotation marks omitted and alterations adopted).

### III.  Discussion

The main issue in this case is the validity of the Agreement's arbitration clause, which Stone contends is ineffective to compel arbitration for two reasons.  First, he argues that the arbitration clause is invalid under New Jersey law because it does not satisfy the requirements of the New Jersey Supreme Court's decision in *Atalese v. U.S. Legal Services Group, L.P.*, 99 A.3d 306 (N.J. 2014).  Opposition at 3-4.  In *Atalese*, the New Jersey Supreme Court held that an arbitration agreement, no matter how clear it otherwise is, must contain an "explanatory comment" stating that by agreeing to arbitration, a party is waiving its right to litigate in court.  99 A.3d at 313-15.  Stone also argues that the arbitration clause's venue provision, which requires the parties to arbitrate in Phoenix, Arizona, renders the arbitration agreement substantively unconscionable. Opposition at 7-9.  In the alternative, Stone maintains that the scope of the parties' arbitration agreement does not reach his statutory NYLL claim.  *Id.* at 4-7.

For the following reasons, the Court holds that *Atalese* is preempted by the FAA to the extent that it purports to invalidate the parties' arbitration agreement in this case, and that the arbitration agreement is not substantively unconscionable.  And because the parties delegated gateway questions of arbitrability to the arbitrator, the Court compels arbitration without resolving whether the scope of the parties' agreement extends to Stone's NYLL claim.  The Court therefore also denies without prejudice Exos's request to dismiss the claim against it and stays this case pending the outcome of arbitration.

A.        **The FAA's Equal Treatment Rule**

The FAA's history and purposes are well known.  The statute grew out of Congress's recognition that arbitration offers "the promise of quicker, more informal, and often cheaper resolutions for everyone involved" in legal disputes—disputes that might otherwise languish on crowded court dockets and subject parties to all the usual burdens and expenses of the formal litigation process. *Epic Sys. Corp. v. Lewis* ("*Epic*"), 584 U.S. 497, 505 (2018); *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010) (observing that parties often favor arbitration due to "lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes").  Yet prior to the statute's enactment, "English and American common law courts routinely refused to enforce agreements to arbitrate disputes" in the same way that those courts would enforce any other ordinary contract. *Epic*, 584 U.S. at 505.  That "judicial hostility towards arbitration . . . had manifested itself in a great variety of devices and formulas declaring arbitration against public policy," rendering the enforceability of arbitration agreements increasingly uncertain. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 342 (2011).  It was in direct response to that hostility and uncertainty that Congress enacted the FAA in 1925. *Viking River Cruises, Inc. v. Moriana* ("*Viking River*"), 596 U.S. 639, 649 (2022).

In seeking to eliminate the "widespread judicial hostility to arbitration agreements," *Concepcion*, 563 U.S. at 339, Congress opted for strong medicine.  The centerpiece of the FAA, Section 2, declares that written arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  That language "reflects the overarching principle that arbitration is a matter of contract." *Am. Exp. Co. v. Italian Colors Rest.* ("*Italian Colors*"), 570 U.S. 228, 233 (2013); *see also Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024) (stressing that "arbitration agreements are simply

contracts").   Section 2 therefore requires states to treat contractual arbitration provisions as just that—ordinary contracts, placing "arbitration agreements 'on equal footing with all other contracts' and enforc[ing] them according to their terms." *Olivieri v. Stifel, Nicolaus & Co., Inc.*, 112 F.4th 74, 84 (2d Cir. 2024) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)); *see Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.* ("*Volt*"), 489 U.S. 468, 478 (1989) (explaining that the FAA "requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms").   So just as a state's law would recognize the enforceability of a contractual provision that requires one to sell his car to another, the law must with equal vigor enforce a promise between the parties to arbitrate any disputes arising out of that transaction.   *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 281 (1995) ("What States may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause.").   Thus, the promise to arbitrate, no less than the promise to sell the car or any other provision in the parties' contract, must be "rigorously enforce[d] . . . according to [its] terms." *Italian Colors*, 570 U.S. at 233.   Only by placing the agreement to arbitrate on equal footing with all other provisions in the contract does a court adhere to the FAA's "policy guaranteeing the enforcement of private contractual arrangements." *Equal Emp. Opportunity Comm'n v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (internal quotation marks omitted).

To that end, the Supreme Court has explained that Section 2 "contains two clauses: An enforcement mandate, which renders agreements to arbitrate enforceable as a matter of federal law, and a saving clause, which permits invalidation of arbitration clauses on grounds applicable to 'any contract.'" *Viking River*, 596 U.S. at 650.   Taken together, these clauses "establish[] an equal-treatment principle: A court may invalidate an arbitration agreement based on generally

applicable contract defenses like fraud or unconscionability, but not on legal rules that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Kindred Nursing Ctrs. Ltd. P'ship v. Clark* ("*Kindred*"), 581 U.S. 246, 251 (2017).  Thus, generally applicable contract defenses in the nature of fraud, duress, or unconscionability are permissible because—when applied in an even-handed manner—they leave arbitration agreements no worse off than any other ordinary contractual provision that state law would normally enforce.  By contrast, when a rule of law imposes burdens on arbitration agreements that do not apply to the mine run of other contractual provisions that the state would generally enforce, the rule fails to treat arbitration agreements as ordinary contracts, thereby interfering with Congress's "liberal federal policy favoring arbitration."  *Concepcion*, 563 U.S. at 339.

Under this approach, the FAA most obviously "preempts any state rule discriminating on its face against arbitration—for example, a law prohibiting outright the arbitration of a particular type of claim."  *Id.* (internal quotation marks omitted and alteration adopted); *see, e.g.*, *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 533 (2012) (per curiam) (holding that the FAA preempted a principle of West Virginia law that prohibited "predispute agreements to arbitrate personal-injury or wrongful-death claims against nursing homes"); *Dr.'s Assocs., Inc. v. Casarotto*, 517 U.S. 681, 688 (1996) (holding that the FAA preempted a Montana statute requiring notice that a contract contains an arbitration clause to appear on the first page of the contract and typed in underlined capital letters).  A state may not, therefore, adopt a rule of law that singles out arbitration agreements for disfavored treatment, *Kindred*, 581 U.S. at 251, or otherwise "places arbitration agreements in a class apart from 'any contract[]'" with respect to the limitations on their validity or enforceability, *Dr.'s Assocs.*, 517 U.S. at 688.  *See Chamber of Com. of the U.S. of Am. v. Bonta* ("*Chamber of Com.*"), 62 F.4th 473, 483 (9th Cir. 2023) ("In considering the

preemptive scope of the FAA, the Supreme Court has focused on cases involving state laws or judge-made rules that single out executed arbitration agreements and prevent the enforcement of such agreements according to their terms.").

Although state law rules that facially discriminate against arbitration agreements are the most obvious candidates for preemption, the Supreme Court has made clear that "even rules that are generally applicable as a formal matter are not immune to preemption by the FAA." *Viking River*, 596 U.S. at 650. Thus, the FAA "also displaces any rule that covertly accomplishes" the objective of discriminating against arbitration "by disfavoring contracts that (oh so coincidentally) have the defining features of arbitration agreements," *Kindred*, 581 U.S. at 251, or which, despite its facial neutrality, "would have a disproportionate impact on arbitration agreements," *Concepcion*, 563 U.S. at 342. Accordingly, Section 2's "saving clause does not save defenses that target arbitration either by name or by more subtle methods, such as by interfering with fundamental attributes of arbitration." *Epic*, 584 U.S. at 508 (internal quotation marks omitted and alteration adopted). Under that principle, even a generally applicable rule of contract formation or interpretation "is preempted to the extent it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the FAA." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 183, 188-89 (2019); *see Concepcion*, 563 U.S. at 343 ("Although § 2's saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives.").

## B.    The Parties Entered into a Valid Arbitration Agreement.

With these standards in mind, the Court considers Stone's challenge to Section 13 of the Agreement, which contains the parties' purported agreement to arbitrate and, according to Exos

and MediFit, a delegation of authority to the arbitrator to decide gateway questions of arbitrability.[3] Because Stone's arguments—*i.e.*, that the arbitration agreement runs afoul of *Atalese*'s explanatory comment rule and that its venue provision is unconscionable—constitute specific attacks on the validity of the arbitration agreement itself and its purported delegation of questions of arbitrability to the arbitrator, the Court must resolve those challenges before compelling arbitration of Stone's NYLL claim or of any gateway questions of arbitrability. *See Coinbase*, 602 U.S. at 151; *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010). For the following reasons, the Court holds that the FAA preempts *Atalese* to the extent that *Atalese* purports to invalidate the parties' arbitration agreement, and that the arbitration agreement's venue provision is not substantively unconscionable. Accordingly, the Court rejects Stone's challenges to the validity of the parties' arbitration agreement.

### 1. New Jersey Arbitration Law

In many ways, New Jersey law[4] parallels the federal approach to arbitration discussed earlier. As Congress did through the FAA, New Jersey "codifie[d] its own hospitable approach toward arbitration in the New Jersey Arbitration Act," or "NJAA" for short. *Kernahan v. Home Warranty Adm'r of Fla., Inc.*, 199 A.3d 766, 776 (N.J. 2019). The NJAA, "using terms nearly identical to those of the FAA," *id.*, provides that agreements to arbitrate are "valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a

---

[3] Stone and MediFit do not dispute that they executed the Agreement. *See* Spinks Decl. ¶ 6; Agreement at 9.

[4] As noted, the Agreement contains a choice-of-law provision selecting New Jersey law. Agreement § 7 ("This Agreement shall be deemed a contract made under, and for all purposes shall be construed in accordance with, the laws of the State of New Jersey applicable to contracts to be performed entirely within such State."). Consistent with that selection, the parties' briefs assume that New Jersey law applies, *see* Motion at 5-6; Opposition at 3-4; Reply at 1-6, and that implied consent additionally establishes choice-of-law. *See Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014).

contract," N.J. Stat. Ann. § 2A:23B-6(a).  The New Jersey Supreme Court has therefore observed

that "[t]he statutory policies of the FAA and New Jersey law are in synchronicity."  *Kernahan*,

199 A.3d at 776; *see Arafa v. Health Express Corp.*, 233 A.3d 495, 506 (N.J. 2020) ("The [NJAA]

is nearly identical to the FAA and enunciates the same policies favoring arbitration.").

 The New Jersey Supreme Court has also recognized, however, that the "favored status"

accorded to arbitration agreements under the FAA and the NJAA "is not without limits."  *Garfinkel*

*v. Morristown Obstetrics & Gynecology Assocs., P.A.*, 773 A.2d 665, 670 (N.J. 2001).  One

principle that the New Jersey Supreme Court has recognized as a limit on arbitration's favored

status is New Jersey's rule that waivers of statutory or constitutional rights must be knowing and

voluntary, and must be expressed clearly and unmistakably.  *See Knorr v. Smeal*, 836 A.2d 794,

798 (N.J. 2003) ("An effective waiver requires a party to have full knowledge of his legal rights

and intent to surrender those rights."); *Garfinkel*, 773 A.2d at 670, 672 (explaining that under New

Jersey law, "a party's waiver of statutory rights must be clearly and unmistakably established" and

must be "knowing and voluntary" (internal quotation marks omitted)).

 The leading decision applying New Jersey's clear statement rule for waivers of statutory

or constitutional rights in the arbitration context is *Atalese v. U.S. Legal Services Group, L.P.*,

99 A.3d 306 (N.J. 2014).  In *Atalese*, the New Jersey Supreme Court considered whether a trial

court properly compelled arbitration of statutory consumer protection claims pursuant to an

arbitration provision contained in a consumer contract.  *Id.* at 309.  In full, the arbitration clause

provided:

> **Arbitration:** In the event of any claim or dispute between Client and the USLSG
> related to this Agreement or related to any performance of any services related to
> this Agreement, the claim or dispute shall be submitted to binding arbitration upon
> the request of either party upon the service of that request on the other party.  The
> parties shall agree on a single arbitrator to resolve the dispute.  The matter may be
> arbitrated either by the Judicial Arbitration Mediation Service or American

> Arbitration Association, as mutually agreed upon by the parties or selected by the party filing the claim. The arbitration shall be conducted in either the county in which Client resides, or the closest metropolitan county. Any decision of the arbitrator shall be final and may be entered into any judgment in any court of competent jurisdiction. The conduct of the arbitration shall be subject to the then current rules of the arbitration service. The costs of arbitration, excluding legal fees, will be split equally or be born by the losing party, as determined by the arbitrator. The parties shall bear their own legal fees.

*Id.* at 310. In an unpublished opinion, the intermediate appellate court had concluded that the parties' arbitration agreement satisfied the New Jersey Supreme Court's heightened standard for contractual waiver-of-rights provisions. *Atalese v. U.S. Legal Servs. Grp., L.P.*, No. A-0654-12T3, 2013 WL 645729, at *3 (N.J. Super. Ct. App. Div. Feb. 22, 2013). The court explained that the arbitration clause was set off in a separate paragraph of the contract, was titled "Arbitration" in bolded font, stated "plainly and clearly" that any claims between the parties "shall be submitted to binding arbitration," and set forth in detail how the arbitration would be conducted. *Id.* The court also observed that the arbitration provision explained the difference between the role that the arbitrator would play in the parties' dispute ("to resolve the dispute" and to render a "final" "decision") and the role that a court would play (to enter the arbitrator's "final" "decision" in a "judgment"). *Id.* at *1, *3. The court therefore held that the arbitration provision was sufficiently clear and unambiguous to bind the parties to arbitration. *Id.* at *3.

The New Jersey Supreme Court reversed. In analyzing the validity of this provision, the New Jersey Supreme Court emphasized that "because arbitration involves a waiver of the right to pursue a case in a judicial forum, courts take particular care in assuring the knowing assent of both parties to arbitrate, and a clear mutual understanding of the ramifications of that assent." *Atalese*, 99 A.3d at 313 (internal quotation marks omitted). Reasoning that "an average member of the public may not know . . . that arbitration is a substitute for the right to have one's claim adjudicated in a court of law," the court held that arbitration agreements, no matter how clear they otherwise

are, must include an "explanatory comment" to the effect that "by choosing arbitration one gives up the time-honored right to sue." *Id.* at 313-15. The New Jersey Supreme Court explained that "[t]he point" of its explanatory comment rule "is to assure that the parties know that in electing arbitration as the exclusive remedy, they are waiving their time-honored right to sue." *Id.* at 314 (internal quotation marks omitted). So because, in the court's view, the parties' agreement to arbitrate did not specifically "explain what arbitration is," "indicate how arbitration is different from a proceeding in a court of law," or otherwise "explain that the plaintiff is giving up her right to bring her claims in court or have a jury resolve the dispute," the New Jersey Supreme Court held that the provision was ineffective. *Id.* at 315-16.

*Atalese*, therefore, holds that arbitration agreements must satisfy a heightened clear statement rule—something in the nature of a knowing and voluntary standard—to be enforceable, and in meeting that standard must include an explanatory comment specifically stating that agreeing to resolve a dispute through arbitration means agreeing not to resolve that same dispute through litigation in court or before a jury. *Atalese*'s rule, to date, has been applied in "the context of employment and consumer contracts." *In re Remicade (Direct Purchaser) Antitrust Litig.* ("*Remicade*"), 938 F.3d 515, 525 (3d Cir. 2019) (collecting cases).

### 2. The FAA Preempts *Atalese* as Applied to the Parties' Arbitration Agreement.

Exos and MediFit do not dispute that the Agreement's arbitration provision would be invalid under *Atalese*'s heightened standard for arbitration agreements. Indeed, the Agreement nowhere provides the type of explanatory comment required by *Atalese* specifically defining an agreement to arbitrate as including a waiver of one's right to litigate in court or before a jury. *See Atalese*, 99 A.3d at 315. Thus, if *Atalese* controls, Exos and MediFit's motion to compel must be denied.

Whether the Agreement's arbitration provision is effective to compel arbitration of Stone's NYLL claim therefore depends on whether the FAA preempts *Atalese* as applied to this case. Because the FAA neither contains an "express pre-emptive provision" nor indicates an intent on Congress's part to "occupy the entire field of arbitration," *Volt*, 489 U.S. at 477, the preemption question in this case turns on whether *Atalese* "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the FAA. *Concepcion*, 563 U.S. at 352 (internal quotation marks omitted); *see Chamber of Com.*, 62 F.4th at 481-83. As discussed, those congressional objectives principally include ensuring that agreements to arbitrate are placed on equal footing with all other contractual agreements and guaranteeing that arbitration agreements are rigorously enforced according to their terms—subject to generally applicable contract defenses like fraud or duress. *See Concepcion*, 563 U.S. at 339. Thus, the key question is whether *Atalese* treats arbitration agreements as ordinary contracts, subject to the same set of rules as any other agreement that New Jersey law would enforce.

There is relatively little judicial authority substantively addressing whether *Atalese* is consistent with Congress's objectives in enacting the FAA. In *Atalese* itself, the New Jersey Supreme Court largely justified its approach by explaining that "[t]he requirement that a contractual provision be sufficiently clear to place a consumer on notice that he or she is waiving a constitutional or statutory right is not specific to arbitration provisions," but instead applies to "any contractual waiver-of-rights provision." 99 A.3d at 313 (internal quotation marks omitted); *see also Kernahan*, 199 A.3d at 777 (noting that "plain language explanations of consequences had been required in contract cases in numerous other settings where a person would not be presumed to understand that what was being agreed to constituted a waiver of a constitutional or statutory right"). To that end, the New Jersey Supreme Court explained that its holding in *Atalese*

would ensure that waivers of statutory and constitutional rights inherent in agreements to arbitrate are knowing and voluntary. *See Atalese*, 99 A.3d at 313, 316. The *Atalese* court also characterized its approach as flowing from the general principle that contracts "must be the product of mutual assent," and that "[m]utual assent requires that the parties have an understanding of the terms to which they have agreed." *Id.* at 312-13 (internal quotation marks omitted). The New Jersey Supreme Court echoed that view in *Kernahan*, explaining that *Atalese*'s holding was "rooted in the notion that mutual assent had not been achieved because the provision did not, in some fashion, explain that it was intended to be a waiver of the right to sue in court." 199 A.3d at 777; *see also id.* at 783-85 (Albin, J., concurring) (characterizing *Atalese*'s rule as arising out of the generally applicable doctrine of mutual assent).[5] Following these decisions, New Jersey's lower courts have continued to apply *Atalese* as consistent with the FAA. *See, e.g.*, *Little v. Am. Income Life Ins. Co.*, No. A-3741-23, 2025 WL 1550016, at *8 (N.J. Super. Ct. App. Div. May 30, 2025).

Federal courts applying New Jersey law, meanwhile, have largely avoided addressing *Atalese*'s consistency with the FAA while observing that there is a substantial question as to whether *Atalese*'s rules are preempted as applied to arbitration agreements. *See, e.g.*, *Remicade*, 938 F.3d at 526 (declining to address whether *Atalese*'s rule "would be preempted—either because it is too tailor-made to arbitration agreements to survive the FAA's edict against singling out those contracts for disfavored treatment, or because it interferes with fundamental attributes of arbitration" (internal quotation marks and citations omitted)); *Guidotti v. Legal Helpers Debt*

---

[5] The *Atalese* court also noted that for consumer contracts, New Jersey law imposes an additional requirement that such contracts be "written in a simple, clear, understandable and easily readable way." *Atalese*, 99 A.3d at 314 (quoting N.J. Stat. Ann. § 56:12-2). Neither party, however, has suggested that Section 56:12-2 supplies a generally applicable rule of interpretation or formation for employment contracts like the one at issue in this case, and in any event, the statute is clear that the "[u]se of technical terms or words of art" is not in itself a violation of the plain language rule. N.J. Stat. Ann. § 56:12-2.

*Resol., L.L.C.*, 639 F. App'x 824, 827 (3d Cir. 2016) (not precedential) (observing that whether *Atalese*'s rule "remain[s] viable as not preempted by the [FAA] presents an important and challenging question"); *Bacon v. Avis Budget Grp., Inc.*, No. 16 Civ. 5939 (KM), 2017 WL 2525009, at *6 & n.6 (D.N.J. June 9, 2017) (similar).

Under the principles of FAA preemption discussed above, the Court holds that *Atalese* is preempted to the extent that it purports to invalidate the parties' arbitration agreement in this case. That is so for two reasons. First, *Atalese*'s explanatory comment rule discriminates against arbitration by imposing an arbitration-specific exception to New Jersey's general approach to the formation and interpretation of employment contracts, requiring courts to presumptively disregard that the accepted meaning of arbitration entails a waiver of the right to litigate in court. Second, by requiring arbitration agreements to meet a heightened level of clarity based on the fact that such an agreement entails a waiver of statutory or constitutional rights, *Atalese* relegates arbitration agreements to second-class status based on one of their fundamental characteristics, thereby interfering with arbitration. In each of these ways, *Atalese* prevents courts from rigorously enforcing arbitration agreements according to their plain terms and fails to ensure equality between arbitration agreements and all other contractual agreements, thereby posing an unacceptable obstacle to the FAA's liberal policy favoring arbitration. As applied to this case, *Atalese*'s rule fails to treat the parties' arbitration agreement as an ordinary contract and therefore cannot prevent its enforcement consistent with the FAA.

First, *Atalese* singles out arbitration agreements for "disfavored treatment" by departing from New Jersey's usual approach to contract formation and interpretation in assessing the meaning of the word "arbitration" and its variants. *Kindred*, 581 U.S. at 252. Under New Jersey's usual approach to contract formation and interpretation, courts must "enforce [a] contract

according to its terms." *GMAC Mortg., LLC v. Willoughby*, 165 A.3d 787, 794 (N.J. 2017).  And

in the absence of defenses like fraud, duress, or mutual mistake, courts must "conclusively

presume[]" that the parties to a contract "understand and assent to its terms and legal effect"

regardless of whether those terms have been specifically explained to them.  *Rudbart v. N. Jersey

Dist. Water Supply Comm'n*, 605 A.2d 681, 685 (N.J. 1992) (quoting *Fivey v. Pa. R.R. Co.*, 52 A.

472, 473 (N.J. 1902)).  Under that "long-settled principle" of New Jersey law, a party cannot

escape the accepted meaning of unambiguous contractual language simply because it might have

had a contrary understanding of the terms used.  *Schor v. FMS Fin. Corp.*, 814 A.2d 1108, 1112

(N.J. Super. Ct. App. Div. 2002) (internal quotation marks omitted and alteration adopted).

These universal principles of contract law apply even to contracts of adhesion, which

remain fully enforceable according to their terms unless they rise to the level of unconscionability

or run afoul of another general contract defense. [6]  *See Vitale v. Schering-Plough Corp.*, 174 A.3d

973, 980 (N.J. 2017) (describing a contract of adhesion as "a private contract, subject to the general

principle that parties are afforded the liberty to bind themselves as they see fit" (internal quotation

marks omitted)); *Stelluti v. Casapenn Enters., LLC*, 1 A.3d 678, 687 (N.J. 2010) ("Although a

contract of adhesion may require one party to choose either to accept or reject the contract as is,

the agreement nevertheless may be enforced."); *see also Chamber of Com.*, 62 F.4th at 488-89

(applying similar principles as a matter of California law).  But when *Atalese* applies, these

fundamental principles are reversed with respect to the meaning of arbitration: absent a further

---

[6] Apart from the substantive unconscionability challenge relating to the venue provision in the Agreement's arbitration clause discussed *infra* III.B.3, Stone does not argue that the Agreement's arbitration clause is unfair to him or that the Agreement is procedurally unconscionable.  And under the FAA, "'[m]ere inequality in bargaining power' is not a sufficient reason to refuse to enforce an arbitration agreement in the employment context" according to general principles of contract law.  *Chamber of Com.*, 62 F.4th at 489 (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991)).

"explanatory comment," a court must *refuse* to give the term arbitration and its variants their accepted meaning for purposes of assessing mutual assent and presume instead that the protected party does *not* understand the concept of arbitration or that agreeing to arbitrate means agreeing not to litigate in court. *See Kernahan*, 199 A.3d at 777-78 (affirming that absent an explanatory comment, courts may not "attribute knowledge" of the definition of arbitration to those protected by *Atalese*'s rule).

This approach impermissibly "derive[s]" from "the fact that an agreement to arbitrate is at issue." *Concepcion*, 563 U.S. at 339. As the New Jersey Supreme Court has explained, courts must disregard the full, objective meaning of the term "arbitration" precisely *because* "[t]he meaning of arbitration is not self-evident." *Morgan v. Sanford Brown Inst.*, 137 A.3d 1168, 1180 (N.J. 2016); *see also Kernahan*, 199 A.3d at 784 (Albin, J., concurring) (justifying *Atalese* on the ground that "the term arbitration is not self-defining"). The New Jersey Supreme Court, subsequent to *Atalese*, supported that conclusion based in part on its review of a "statistical study" supposedly proving that "'consumers have no idea what they are agreeing to when they enter into contracts containing arbitration clauses' and that many consumers believe that access to 'court will be available to them, if only as a last resort.'" *Morgan*, 137 A.3d at 1180 n.7 (quoting Jeff Sovern, Elayne E. Greenberg, Paul F. Kirgis, & Yuxiang Liu, *"Whimsy Little Contracts" with Unexpected Consequences: An Empirical Analysis of Consumer Understanding of Arbitration Agreements*, 75 Md. L. Rev. 1, 63 (2015)). The New Jersey Supreme Court also relied on a study conducted by the Consumer Financial Protection Bureau, which "concluded that a majority of credit-card consumers whose agreements contained arbitration clauses did not understand that they could not file suit in court." *Id.* (citing Consumer Fin. Prot. Bureau, *Arbitration Study Report to Congress, Pursuant to Dodd-Frank Wall Street Reform and Consumer Protection Act § 1028(a)*, § 3 at 3

(2015)). This approach—which disregards New Jersey's usual, objective approach to contract formation and interpretation in favor of a particularized view about what certain segments of the public might subjectively understand regarding the concept of arbitration—is simply "too tailor-made to arbitration agreements" to survive the FAA. *Kindred*, 581 U.S. at 252.

*Atalese*'s rule is also based on a policy preference for litigation in court over arbitration—thereby manifesting exactly the sort of "judicial hostility towards arbitration that prompted the FAA." *Concepcion*, 563 U.S. at 342. The New Jersey Supreme Court has made clear that "[t]he point" of *Atalese*'s approach "is to assure that the parties know that in electing arbitration as the exclusive remedy, they are waiving their time-honored right to sue." *Atalese*, 99 A.3d at 314 (internal quotation marks omitted). As the decision's author later explained, *Atalese*'s heightened standard for arbitration agreements promotes "New Jersey's four-century-old commitment to the civil jury trial," a "self-evident expression of a paramount public policy." *Skuse v. Pfizer, Inc.*, 236 A.3d 939, 959-61 (N.J. 2020) (Albin, J., concurring) (suggesting that contracts which "compel an employee or consumer to waive his or her constitutional right to a civil jury trial and accept arbitration, *arguably*, would be unconscionable and violative of public policy"). *Atalese*'s approach, in other words, is rooted in the view that "because arbitration involves a waiver of the right to pursue a case in a judicial forum," courts should "take particular care in assuring the knowing assent of both parties to arbitrate." *Atalese*, 99 A.3d at 313 (internal quotation marks omitted). But this rationale, which subjects arbitration agreements to heightened judicial scrutiny based on the purported need "to safeguard a person's right to access the courts and to trial by jury," *Kindred*, 581 U.S. at 252, fails to treat arbitration agreements as ordinary contracts and is just what Congress sought to preempt through the FAA. *See Andermann v. Sprint Spectrum L.P.*, 785 F.3d 1157, 1159-60 (7th Cir. 2015) (Posner, J.) (explaining that the FAA prevents courts from

"allow[ing] any preference they might have for judicial resolution of a legal dispute to override the parties' dispute-resolution preferences as embodied in an arbitration clause").

*Atalese*'s rule cannot be defended as an ordinary application of New Jersey's "mutuality of assent" doctrine applicable to all contractual provisions. *Kernahan*, 199 A.3d at 777. New Jersey, like all U.S. jurisdictions, generally follows the objective theory of mutual assent, which provides that "[o]bjective manifestations of intent are controlling when determining if there was a meeting of the minds." *Available Trade Int'l, LLC v. Tekno Prods., Inc.*, No. 19 Civ. 14851 (JMV), 2021 WL 7907665, at *3 (D.N.J. Aug. 24, 2021) (citing *Brawer v. Brawer*, 747 A.2d 790, 795-96 (N.J. Super. Ct. App. Div. 2000)); *see* 1 Richard A. Lord, *Williston on Contracts* § 4:19 (4th ed. 2008) ("According to the objective theory of contract formation, what is essential is not assent, but rather what the person to whom a manifestation is made is justified as regarding as assent."). And as the Third Circuit has explained, "[a]rbitration agreements in the employment context are not exempt from this principle." *Morales v. Sun Constructors, Inc.*, 541 F.3d 218, 222 (3d Cir. 2008) (applying the objective theory of mutual assent as a matter of Virgin Islands law).

Yet when it comes to the meaning of the word "arbitration," *Atalese* uniquely requires courts to disregard the fact that an agreement to arbitrate objectively manifests an agreement not to litigate in court unless the contract provides a specific explanation to that effect. *See Kernahan*, 199 A.3d at 777-78. That rule fails to accord with the objective theory's usual presumption that parties understand and agree to all of the terms of a contract to which they have objectively manifested assent. *See Booker v. Robert Half Int'l, Inc.*, 315 F. Supp. 2d 94, 100 (D.D.C. 2004) (explaining that under the objective theory of mutual assent, applied as a matter of District of Columbia law, the fact that an "arbitration provision was not adequately explained to [the plaintiff]" cannot render the provision unenforceable). And this approach is particularly striking

21

given that under New Jersey law, even those who are *illiterate* or *unable to understand English* are generally bound to the contractual terms to which they have manifested objective assent regardless of whether the counterparty explained the meaning or legal effect of those terms.  *See Kang v. LA Fitness*, No. 14 Civ. 7147 (KSH), 2016 WL 7476354, at *5 (D.N.J. Dec. 29, 2016). Indeed, neither the *Atalese* court nor the parties have identified any other words in an employment agreement besides arbitration and its variants that require an explanatory comment under New Jersey law before the Court may enforce them according to their accepted meaning.[7]  *See Dr.'s Assocs.*, 517 U.S. at 687 (holding that states may not "condition[] the enforceability of arbitration agreements on compliance with a special notice requirement not applicable to contracts generally").

Nor can *Atalese*'s approach be fairly characterized as an even-handed application of New Jersey's clear statement rule for waivers of statutory or constitutional rights.  As *Atalese* itself recognizes, "[b]y its very nature, an agreement to arbitrate involves a waiver of a party's right to have her claims and defenses litigated in court."  99 A.3d at 313 (internal quotation marks omitted). Indeed, a party's "waiver of the right to go to court and receive a jury trial" is "the *primary characteristic* of an arbitration agreement."  *Kindred*, 581 U.S. at 252 (emphasis added).  Federal courts have therefore repeatedly held that an agreement to arbitrate clearly and unambiguously reflects an agreement not to litigate in court or before a jury.  *See Huffman v. Hilltop Cos.*, 747 F.3d 391, 396 n.2 (6th Cir. 2014) ("[The Sixth Circuit] has flatly rejected the contention that an arbitration clause must contain a provision expressly waiving the employee's right to a jury trial

---

[7] There is no indication, for instance, that a court applying New Jersey law would be required to disregard the meaning of the terms "specific performance," "injunctive relief," and "equitable relief" as used in the parties' remedies clause, Agreement § 6, on the ground that the Agreement fails to provide an explanatory comment regarding the meaning and effect of those inherently legal terms.

because [that] fairly obvious consequence of an agreement to arbitrate is straightforward." (internal quotation marks omitted)); *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 638 (4th Cir. 2002) (similar); *Pierson v. Dean, Witter, Reynolds, Inc.*, 742 F.2d 334, 339 (7th Cir. 1984) (similar).

But *Atalese* requires courts to invalidate arbitration provisions, no matter how clear or unambiguous those provisions are, if they do not contain an explanatory comment that agreeing to resolve a dispute through arbitration means agreeing not to resolve that dispute through litigation in court. That is so even when, as in *Atalese* itself, the parties' agreement unambiguously states that any claim or dispute "shall be submitted to binding arbitration," specifies that arbitration entails a "final" "decision" regarding the dispute by "a single arbitrator," incorporates by reference a specific set of arbitral rules that clearly explain how the arbitration would work, and provides that the role of the court is merely to enter the arbitrator's final decision as a judgment. *Atalese*, 99 A.3d at 310. Under general principles of contract interpretation, it strains credulity to characterize such a provision as anything less than clear and unambiguous. So in reality, *Atalese*'s explanatory comment rule is an arbitration-specific departure even from New Jersey's clear statement rule applicable to waivers of statutory and constitutional rights more broadly—that is, it effectively places a targeted limitation on the effect of the term arbitration and its variants in assessing whether the applicable degree of clarity for a waiver has been met.

*Atalese*'s command to disregard the clear meaning of arbitration in employment contracts absent an explanatory comment cannot be reconciled with the FAA's liberal policy favoring arbitration. *See Booker*, 315 F. Supp. 2d at 100 ("Employment contracts are within the FAA and the federal policy strongly favoring arbitration." (citing *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001))). Countless arbitration agreements are drafted (and have been drafted) with the

reasonable expectation that under an objective standard of mutual assent, or even under a clear statement standard, it would not be necessary to spell out that agreeing to resolve a dispute through arbitration means agreeing not to resolve that dispute through litigation in court. Thus, *Atalese*'s rule is almost certain to have a "disproportionate impact on arbitration agreements," wiping out every consumer and employment arbitration agreement subject to the rule, no matter how clear on its face, that happens to lack the requisite explanatory comment. *Concepcion*, 563 U.S. at 342. And at the same time, this disfavored treatment makes it impossible for courts applying New Jersey law to "rigorously enforce" a broad swath of arbitration provisions in covered contracts according to their plain terms—even as the rest of those contracts would remain binding under usual principles of formation and interpretation. *Italian Colors*, 570 U.S. at 233 (internal quotation marks omitted); *see, e.g.*, *Dispenziere v. Kushner Cos.*, 101 A.3d 1126, 1128, 1132 (N.J. Super. Ct. App. Div. 2014) (refusing to enforce, for supposed lack of clarity, an arbitration agreement providing that "[a]ny disputes arising in connection with this Agreement other than [certain exceptions] shall be heard and determined by arbitration before a single arbitrator of the American Arbitration Association in Morris County, New Jersey. The decision of the arbitrator shall be final and binding.").[8] In both ways, *Atalese* fails to treat arbitration agreements as ordinary contracts and stands as an obstacle to the full accomplishment of Congress's objectives in enacting the FAA.

Second, *Atalese*'s rule is preempted because it "interferes with arbitration." *Concepcion*, 563 U.S. at 346. An indispensable feature of arbitration agreements is a waiver of whatever

---

[8] In *Concepcion*, the Supreme Court noted that states "remain free to take steps addressing the concerns that attend contracts of adhesion—for example, requiring class-action-waiver provisions in adhesive agreements to be highlighted." 563 U.S. at 347 n.6. The court, however, emphasized that "[s]uch steps cannot . . . conflict with the FAA or frustrate its purpose to ensure that private arbitration agreements are enforced according to their terms." *Id.* By requiring courts to disregard the accepted meaning of arbitration agreements absent a further explanatory comment, *Atalese* does just that.

statutory or constitutional rights are inconsistent with exclusive arbitral proceedings, including, among other things, the right to litigate one's claims in court or before a jury. *See Kindred*, 581 U.S. at 251-52. Yet *Atalese*'s explanatory comment rule is founded on the notion that a waiver of such rights must be "knowing and voluntary," a heightened standard of assent not applicable to ordinary contracts. *Atalese*, 99 A.3d at 313, 316 (quoting *Garfinkel*, 773 A.2d at 672); *see Skuse*, 236 A.3d at 961 (Albin, J., concurring) (characterizing *Atalese* as requiring consumers to "voluntarily and knowingly waive their rights to access the courts" for an arbitration agreement to be effective). As a result, under *Atalese* "an employer cannot enter into a contract with . . . terms essential to an arbitration agreement" without satisfying a heightened standard of judicial scrutiny not applicable to the mine run of other contractual provisions that are typically found in an employment agreement. *Chamber of Com.*, 62 F.4th at 486-87. So "[b]ecause a person who agrees to arbitrate disputes must necessarily waive" various statutory or constitutional rights inconsistent with private arbitration, including the right to litigate in court or before a jury, *Atalese*'s rule interferes with arbitration. *Id.* at 486. Accordingly, *Atalese*'s application of a heightened knowing and voluntary standard to arbitration agreements is inconsistent with the FAA's liberal policy favoring arbitration. *See Morales*, 541 F.3d at 224 (holding that the application of a heightened "'knowing and voluntary' standard to arbitration agreements would be inconsistent with the FAA"); *Awuah v. Coverall N. Am., Inc.*, 703 F.3d 36, 45 (1st Cir. 2012) (similar).

It is no answer to say that *Atalese*'s rule complies with the FAA's equal treatment principle because it treats arbitration agreements in the same way as other agreements to waive statutory or constitutional rights. *See Atalese*, 99 A.3d at 313; *Kernahan*, 199 A.3d at 783-84 (Albin, J., concurring). The FAA's equal treatment principle requires states to "place[] arbitration agreements on equal footing with *all* other contracts," *Cardegna*, 546 U.S. at 443 (emphasis

added), not on equal footing with a disfavored subset of contracts that have been singled out for judicial suspicion.  *See Chamber of Com.*, 62 F.4th at 487 ("It is irrelevant that the [rule] could also apply to other sorts of contractual provisions . . . because the Supreme Court has emphasized that the focus should be on whether the [rule], either on its face or as applied, imposes burdens on arbitration agreements that do not apply to contracts generally." (internal quotation marks omitted)). [9]  Indeed, "[p]lacing arbitration agreements within that class reveals the kind of hostility to arbitration that led Congress to enact the FAA" in the first place.  *Kindred*, 581 U.S. at 253-54 (internal quotation marks omitted).   And by requiring arbitration agreements to satisfy a heightened standard of judicial scrutiny faced only by a disfavored subset of contracts, *Atalese* subjects arbitration agreements to "uncommon barriers," *Kindred*, 581 U.S. at 252, placing them "in a class apart" from ordinary contracts.  *Dr.'s Assocs.*, 517 U.S. at 688.

In any event, the Supreme Court has made clear that "even rules that are generally applicable as a formal matter are not immune to preemption by the FAA." *Viking River*, 596 U.S. at 650; *see Concepcion*, 563 U.S. at 343 ("Although § 2's saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives.").  And to hold that the FAA's equal treatment principle can be satisfied by treating arbitration agreements as "equal" to a

---

[9] The Court notes that the plain language of the FAA's saving clause only exempts from preemption "grounds . . . for the revocation of *any* contract," 9 U.S.C. § 2 (emphasis added), and some courts have held that state contract rules that apply only to a subset of contracts are preempted on that basis alone.  *See, e.g.*, *Dr.'s Assocs., Inc. v. Hamilton*, 150 F.3d 157, 163 (2d Cir. 1998) (holding that a rule is not generally applicable when it applies only to "one sort of contract provision" and "only one type of contract"); *Fitz v. Islands Mech. Contractor, Inc.*, No. 08 Civ. 60 (RLF), 2010 WL 2384585, at *7 (D.V.I. June 9, 2010) (holding that a rule "cannot be said to be a generally applicable principle of contract law" where "it is limited to a specific type of contract— an agreement involving the waiver of constitutional rights").  *But see Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425, 432-33 (9th Cir. 2015) (holding that a rule need not literally apply to "any contract" to fall within Section 2's saving clause).

disfavored minority of contractual provisions that must withstand a heightened standard of judicial scrutiny would not be consistent with the statute's fundamental goal of "promot[ing] arbitration." *Concepcion*, 563 U.S. at 345.  That inconsistency is nowhere made clearer than in the context of this case, where applying *Atalese* would require the Court to invalidate a contractual arbitration agreement unambiguously providing that "[a]ny controversy, dispute or claim arising out of or relating to this Agreement, or any breach thereof, shall be settled by binding arbitration." Agreement § 13.  At the end of the day—in the absence of fraud, duress, unconscionability, or similarly general defenses—such an agreement simply cannot be invalidated under state law for lack of textual clarity consistent with the FAA's central command that "courts must rigorously enforce arbitration agreements according to their terms."  *Italian Colors*, 570 U.S. at 233 (internal quotation marks omitted); *see Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984) (explaining that the FAA "withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration").

For all of these reasons, the Court holds that to the extent *Atalese*'s rule purports to invalidate the parties' arbitration agreement in this case, the rule "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the FAA.  *Concepcion*, 563 U.S. at 352 (internal quotation marks omitted).  Accordingly, the Court rejects Stone's argument that the parties' arbitration agreement fails for lack of textual clarity.

### 3. The Arbitration Agreement's Venue Provision Is Not Substantively Unconscionable.

Stone also contends that the Agreement's arbitration clause is substantively unconscionable because it specifies Phoenix, Arizona (where MediFit is headquartered) as the venue for arbitral proceedings.  Opposition at 7-9.  As noted, Section 2 of the FAA permits a court to "invalidate an arbitration agreement based on generally applicable contract defenses like fraud

or unconscionability." *Kindred*, 581 U.S. at 251 (internal quotation marks omitted); *accord Delta Funding Corp. v. Harris*, 912 A.2d 104, 110 (N.J. 2006) (adhering to "the basic premise that when a party to an arbitration agreement argues that the agreement is unconscionable and unenforceable, that claim is decided based on the same state law principles that apply to contracts generally"). The Court therefore considers whether the Agreement's designation of Phoenix as the venue for arbitration renders the parties' arbitration agreement unconscionable under general principles of New Jersey law.

Here, Stone argues that the arbitration agreement's selection of Phoenix as the venue for arbitration is substantively unconscionable because it will make it more expensive to pursue his claims in arbitration.   Opposition at 7-9.[10]   Under New Jersey law, however, a contractual provision may only be found substantively unconscionable "if it is 'excessively disproportionate' and involves an 'exchange of obligations so one-sided as to shock the court's conscience.'" *Argabright v. Rheem Mfg. Co.*, 258 F. Supp. 3d 470, 481 (D.N.J. 2017) (quoting *Delta Funding Corp.*, 912 A.2d at 120).   And in the arbitration context, "[e]ven when costs are significant and unpleasant, an arbitration agreement may not be substantively unconscionable as long as arbitration is not *prohibitively* expensive." *Montgomery v. Bristol-Myers Squibb Co.*, No. 19 Civ. 19948 (FLW), 2020 WL 3169373, at *7 (D.N.J. June 15, 2020) (emphasis added) (internal quotation marks omitted).   In accordance with that high standard, the U.S. Supreme Court has held that it would be inconsistent with the FAA's "liberal federal policy favoring arbitration" to invalidate an arbitration agreement on grounds of cost-prohibitiveness where the plaintiff fails to satisfy their "burden of showing the likelihood of incurring such [prohibitive] costs" or where the

---

[10] As noted, *supra* n.6, Stone does not advance any arguments regarding procedural unconscionability.

"risk" that the plaintiff would be "saddled with prohibitive costs is too speculative." *Green Tree Fin. Corp.-Ala. v. Randolph* ("*Green Tree*"), 531 U.S. 79, 90-92 (2000) (internal quotation marks omitted); *see Spinetti v. Serv. Corp. Int'l*, 324 F.3d 212, 217 (3d Cir. 2003) ("A party seeking to invalidate an arbitration agreement because arbitration would be prohibitively expensive bears the burden of showing this likelihood.").

Under these principles, Stone's unconscionability challenge fails out of the gate because he provides virtually no information regarding the additional expense to him, if any, that will result from the arbitration taking place in Phoenix or whether that expense will prove cost-prohibitive. *Green Tree*, 531 U.S. at 90.  Stone relies entirely on his allegations that he earned $23.00 per hour and that while the venue for the arbitration is in Phoenix, he lives in New York.  Opposition at 8. But he does not attempt to quantify the expense associated with travel to Phoenix or address whether those expenses could be mitigated in any way, such as by holding the arbitration virtually. Nor does he provide any information regarding his current income and assets.  And even if holding the arbitration in Phoenix, where MediFit is headquartered, would advantage the company in terms of cost savings and convenience, Stone does not provide any information beyond his say-so indicating that this advantage would be excessive or shock the conscience.  On this paper-thin record, "[t]he 'risk' that [Stone] will be saddled with prohibitive costs" as a result of the arbitration taking place in Phoenix "is too speculative to justify the invalidation of [the parties'] arbitration agreement." *Green Tree*, 531 U.S. at 91.

\* \* \*

For these reasons, the Court concludes that the FAA preempts *Atalese* to the extent that *Atalese* purports to invalidate the Agreement's arbitration clause, and that the Agreement's

arbitration clause is not substantively unconscionable.   The Court therefore rejects Stone's challenges to the validity and enforceability of the parties' arbitration agreement.

## C.    An Arbitrator Must Decide Whether Stone's Statutory NYLL Claim Is Within the Scope of the Parties' Arbitration Agreement.

Exos and MediFit also seek to compel arbitration of the question of whether Stone's statutory NYLL claim falls within the scope of the parties' arbitration agreement.  Motion at 7-9.

It is well-settled that the FAA "allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions."  *Henry Schein, Inc.*, 586 U.S. at 65. So just as "parties may elect through their contract to have arbitrators (rather than a court) resolve categories of disputes between them, they may similarly contract to have arbitrators (rather than a court) decide whether a particular dispute is to be arbitrated under the terms of the contract." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 189-90 (2d Cir. 2019).  Such "[a]n agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."  *Rent-A-Ctr., W.*, 561 U.S. at 70.

The Supreme Court, however, has cautioned that "courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (cleaned up).  That rule effectively reverses the usual presumption in favor of arbitration, requiring courts to resolve ambiguities in contractual language against a finding that the parties intended to delegate gateway questions of arbitrability to the arbitrator.  *See id.* at 944-45.  Applying that rule, the Second Circuit has held that "[w]here the parties explicitly incorporate procedural rules that empower an arbitrator to decide issues of arbitrability, that incorporation may serve as clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator."  *DDK Hotels, LLC v. Williams-Sonoma,*

*Inc.*, 6 F.4th 308, 318 (2d Cir. 2021) (internal quotation marks omitted).  For example, "[b]ecause the AAA Commercial Arbitration Rules . . . explicitly empower an arbitrator to resolve questions of arbitrability," the Second Circuit "ha[s] found incorporation of these rules into an arbitration agreement to be relevant in evaluating whether there is clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator."  *Id.*

The parties' express incorporation of such procedural rules into an arbitration agreement, however, "does not *per se* show the intent to delegate."  *Citigroup Inc. v. Sayeg*, No. 21 Civ. 10413 (JPC), 2022 WL 179203, at *6 (S.D.N.Y. Jan. 20, 2022).  Instead, "context matters."  *DDK Hotels*, 6 F.4th at 318.  So when "the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes, this—coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability—constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator."  *Id.* at 318-19.  By contrast, when "the arbitration agreement is narrower, vague, or contains exclusionary language suggesting that the parties consented to arbitrate only a limited subset of disputes, incorporation of rules that empower an arbitrator to decide issues of arbitrability, standing alone, does not suffice to establish the requisite clear and unmistakable inference of intent to arbitrate arbitrability."  *Id.* at 319.  In other words, when "there is a qualifying provision (whether described as a carve-out or carve-in) that arguably excludes the present dispute from the scope of the arbitration agreement, that provision creates ambiguity regarding the parties' intent to delegate arbitrability to the arbitrator."  *Id.* at 322.  This ambiguity then "delays application of AAA rules until a decision is made as to whether a question does or does not fall within the intended scope of arbitration, in short, until arbitrability is decided."  *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014).

Here, Exos and MediFit argue that the Agreement indicates a clear and unmistakable intent to delegate issues concerning the scope of the arbitration agreement to the arbitrator because the arbitration agreement incorporates the AAA rules applicable to employment disputes and contains broad language defining the scope of arbitrable issues.  Motion at 8.  As they point out, the relevant AAA rules grant authority to the arbitrator to determine "his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."  Am. Arb. Ass'n, *Employment: Arbitration Rules and Mediation Procedures* 12 (2023), available at https://www.adr.org/media/sj3jfivl/employmentrules_web_3.pdf (last visited July 9, 2025); Am. Arb. Ass'n, *Employment Arbitration Rules and Mediation Procedures* 12 (2016), available at https://www.adr.org/media/tcpbpzhy/employment-arbitration-rules-and-mediation-procedures-january-1-2016.pdf (last visited July 9, 2025).  And the scope of the parties' arbitration agreement extends to "[a]ny controversy, dispute or claim arising out of or relating to this Agreement, or any breach thereof," Agreement § 13, language which courts applying New Jersey law have described as being "indicative of an extremely broad agreement to arbitrate any dispute relating in any way to the contract."  *Remicade*, 938 F.3d at 523 (quoting *Curtis v. Cellco P'ship*, 992 A.2d 795, 802 (N.J. Super. Ct. App. Div. 2010)); *see also id.* at 524 ("New Jersey courts have interpreted the term 'relating to' in the arbitration clause context to be 'extremely broad.'" (quoting *Angrisani v. Fin. Tech. Ventures, L.P.*, 952 A.2d 1140, 1146 (N.J. Super. Ct. App. Div. 2008))).

In his Opposition, Stone does not develop any substantive response to Exos and MediFit's argument that the parties delegated the question of arbitrability to the arbitrator.  To be sure, Stone does dispute that the scope of the parties' arbitration agreement in fact extends to his NYLL claim, arguing that the claim lacks a sufficient connection to the Agreement to satisfy the "arising out of" or "relating to" requirements.  Opposition at 4-7.  But if Exos and MediFit's delegation argument

is correct, then that issue is one for the arbitrator, not this Court, to resolve. And Stone neither presents any particular argument concerning that issue of delegation nor—apart from the issues he raises regarding *Atalese* and unconscionability—indicates whether he disputes that the parties agreed to arbitrate the question of arbitrability. So by failing to "directly address" Exos and MediFit's delegation argument, Stone "has conceded the point by silence." *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *18 n.18 (S.D.N.Y. Sept. 28, 2012); *see Curry Mgmt. Corp. v. JPMorgan Chase Bank, N.A.*, 643 F. Supp. 3d 421, 426 (S.D.N.Y. 2022) ("A party may be deemed to concede an argument by failing to address it in an opposition brief.").

Accordingly, an arbitrator must decide whether the parties' arbitration agreement extends to Stone's statutory NYLL claim.

### D.    The Court Compels Arbitration of Stone's NYLL Claim.

Next, the Court must consider "whether one party to the agreement has failed, neglected or refused to arbitrate." *Beijing Shougang*, 11 F.4th at 162. Under that standard, "[a] party has refused to arbitrate if it commences litigation or is ordered to arbitrate the dispute by the relevant arbitral authority and fails to do so." *Id.* (cleaned up); *see Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Seneca Fam. of Agencies*, 255 F. Supp. 3d 480, 489 (S.D.N.Y. 2017) ("A party can be deemed to have refused arbitration by filing a lawsuit on a matter that comes within the scope of the arbitration clause." (internal quotation marks omitted)).

As discussed, the parties' arbitration agreement, including its delegation of authority to an arbitrator to determine the scope of the agreement, is valid notwithstanding Stone's challenges under *Atalese* and the unconscionability doctrine. But because the Court concludes that an arbitrator must determine whether Stone's NYLL claim falls within the scope of the parties' arbitration agreement, the Court does not ultimately decide whether Stone's NYLL claim arises out of or relates to the Agreement or its breach for purposes of arbitrability. *See Citigroup*,

2022 WL 179203, at *7.    Accordingly, because Stone initiated this litigation instead of commencing arbitration as he was required to do under Section 13 of the Agreement, the Court grants Exos and MediFit's motion to compel arbitration.[11]    The Court therefore denies without prejudice Exos's request to dismiss the claim against it under Rule 12(b)(6).

### E.    The Court Stays This Case Pending the Outcome of Arbitration.

Stone requests that the Court stay this action pending the outcome of arbitration should the Court grant the motion to compel.  Opposition at 9.  The Second Circuit has held that under Section 3 of the FAA, 9 U.S.C. § 3, "a stay of proceedings [is] necessary after all claims have been referred to arbitration and a stay requested."  *Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015); *accord Smith v. Spizzirri*, 601 U.S. 472, 478 (2024).  The Court therefore stays this action pending the outcome of the arbitration proceedings.

### IV.  Conclusion

For these reasons, the Court grants Exos and MediFit's motion to compel arbitration, denies without prejudice Exos's motion to dismiss, and stays this case.  The parties shall commence arbitration within sixty days of the filing of this Opinion and Order.  The parties must submit a

---

[11] The Agreement only refers to Stone and MediFit as its parties, and only those parties signed the Agreement.  Agreement at 2, 9.  But "traditional principles of state law allow a[n] [arbitration] contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel."  *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (internal quotation marks omitted); *see Hirsch v. Amper Fin. Servs., LLC*, 71 A.3d 849, 857, 859 (N.J. 2013) (recognizing that, in appropriate circumstances, "arbitration may be compelled by a non-signatory against a signatory to a contract" (citing *Arthur Andersen*, 556 U.S. at 631)).  Stone has not presented any challenge to Exos's right to invoke the Agreement's arbitration clause for purposes of this dispute based on the fact that it did not sign the Agreement.  To the contrary, in arguing that Exos qualifies as an "employer" for purposes of the NYLL, Stone takes the position that Exos is a "necessary party" to the Agreement.  Opposition at 12.  The Court therefore compels arbitration as to both Exos and MediFit.  *Cf. GateGuard, Inc. v. MVI Sys. LLC*, No. 19 Civ. 2472 (JPC), 2021 WL 4443256, at *9 (S.D.N.Y. Sept. 28, 2021).

joint status letter within two weeks following the conclusion of the arbitration proceedings.  The

Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 24 and

to stay this case.

        SO ORDERED.

Dated: July 9, 2025
      New York, New York

                                              JOHN P. CRONAN
                                  United States District Judge